Jeffery L. WILSON, Plaintiff
and Appellant,

v.

GENERAL MOTORS CORPORATION, a
foreign corporation, Defendant
and Appellee.

Civ. No. 9790.

Supreme Court of North Dakota.

Oct. 5, 1981.

E. J. Rose, Bismarck, for plaintiff and appellant.

Pearce, Anderson & Durick, Bismarck, for defendant and appellee; argued by Harry J. Pearce, Bismarck.

PAULSON, Justice.

Jeffery L. Wilson appeals from an order issued by the District Court of Ward County on February 4, 1980, which denied his motion to set aside the jury's special verdict, vacate a judgment entered against him on October 3, 1979, and for a new trial. We affirm.

On October 26, 1976, Wilson and Rodney Claude Hunter were employed at the Magic Mile Steam Shop in Minot. During their noon lunch break, they drove to Magic City Campus and visited with Mark Todd Dymoke, who requested that Wilson and Hunter accompany him to Bismarck to attend a rock concert. After they had finished work, Wilson and Hunter changed clothes and accompanied Dymoke on the trip to Bismarck in Dymoke's car, a 1976 Buick Skylark.

Prior to leaving Minot to attend the concert, the boys purchased 36 cans of beer at Gordon's Holiday Spot, Inc., a liquor store located in Minot. The boys consumed some beer and peppermint schnapps and smoked marijuana. After the rock concert, the boys ate and then left Bismarck for Minot at approximately 12:30 a. m. on October 27, 1976.

Dymoke and Hunter drank beer during the return trip to Minot. Dymoke drove the car and Hunter was seated in the front seat of the car as a passenger, while Wilson slept in the back seat of the car. Hunter also slept for a time and awoke to notice Dymoke driving in the middle of U. S. Highway No. 83, which, at that point, had only a northbound lane and a southbound lane of traffic, divided by a center line. Hunter yelled "Todd" and Dymoke directed the car back into its proper northbound lane of traffic. Hunter again slept for a time but awakened when he felt a jolt and then observed that the car was leaving U. S. Highway No. 83 and was entering the ditch-type median which, at that point, separated the two northbound lanes of traffic from the two southbound lanes of traffic, approximately five miles south of Minot at north-south mile marker 192.

The car was traveling at a speed in excess of the legal speed limit when it entered the ditch-type median and Hunter again yelled "Todd" and observed that Dymoke was asleep. Hunter ducked under the dash of the car to lessen the impact of the crash. The car traveled down the ditch-type median and hit a crossover road connecting the two northbound and two southbound lanes of traffic on U. S. Highway No. 83. The car also struck a road sign, as well as a concrete culvert which was located under the two northbound lanes of traffic. All three boys were thrown from the car and were unconscious for a time. Hunter awoke and observed that Wilson was alive but in need of medical attention. Hunter stopped an oncoming car and requested aid and the boys were taken to a hospital in Minot.

Dymoke, the driver of the car, was killed in the crash and Wilson was severely injured and is now a quadriplegic. Wilson commenced this action on January 15, 1978. Named as defendants in the action were Reuben J. Ulrich, Jr. (Dymoke's stepfather), Gloria J. Ulrich (Dymoke's natural mother and the wife of Reuben J. Ulrich, Jr.), and Gordon's Holiday Spot, Inc. On March 15, 1978, Wilson filed an amended complaint to include as defendants General Motors Corporation (the manufacturer of the 1976 Buick Skylark involved in the crash) and Fisher Motors, Inc. of Minot (the franchised dealer of General Motors Corporation). Wilson filed a second amended complaint on July 3, 1979.

In his second amended complaint, Wilson alleged that the three mounting bolts and nuts used to attach the torque converter to the flywheel were not properly tightened or torqued and also were of inferior quality and improper design. Wilson alleged that one of the nuts on a mounting bolt loosened and that the nut or mounting bolt temporarily lodged between the rotating flywheel, torque converter, and stationary parts of the bellhousing and engine, causing the rear wheels of the car to momentarily skid and also causing Dymoke to lose control over the vehicle. The second amended complaint was based upon the theories of

breach of implied warranty and strict liability in tort. The theory of negligence, although asserted in the original and in the amended complaint, was not contained in the second amended complaint.

A covenant not to sue was executed by Ethel L. Wilson on behalf of Jeffrey L. Wilson. The covenant not to sue released from the action Reuben J. Ulrich, Jr., Gloria J. Ulrich, and the estate of Mark Todd Dymoke. A stipulation for dismissal was executed by Wilson as to these defendants. Gordon's Holiday Spot, Inc., submitted a motion for summary judgment and the district court granted summary judgment on July 20, 1978.

The trial of this action began on September 11, 1979. Reuben John Ulrich, Jr., testified that the car had 338 miles on the odometer when he purchased the car on September 4, 1976. Prior to the accident, Ulrich and his wife had driven the car on occasion but had not experienced any mechanical difficulty with the car; and his stepson, Mark Todd Dymoke, never notified Ulrich of any problem encountered while he was driving the car. Hunter testified that he had not heard any unusual noises when he was a passenger in the car and that on October 26 and 27, 1976, the car had performed normally at all times prior to the accident. Darrell Orth, a mechanic employed at Fisher Motors, Inc., testified that on August 26, 1976, someone submitted a work order for the car which was later purchased by Ulrich, which order contained the request that the torque converter be tightened to the flywheel bolts. Orth testified that if a bolt were loose on the torque converter and flywheel, the engine and transmission would emit a high-pitched chatter and an "awful noise".

Velmer Louis Battes, an employee at A–1 Wrecking in Williston, testified that he dismantled the 1976 Buick Skylark involved in the crash for the purpose of operating the engine. As he removed the flywheel cover, Battes observed that one bolt was missing from the torque converter and flywheel assembly. Battes also observed that a piece of the engine mounting had been broken.

Donn Neal Peterson, a consulting mechanical engineer, observed a hole in the top of the bellhousing and gouges and scratches in the torque converter. In Peterson's opinion, the gouges and scratches in the flywheel were caused by the loose bolt being temporarily wedged between the rotating flywheel and the stationary parts of the engine block. Peterson testified that in his opinion the crash could have resulted due to a locked transmission and drive train which caused Dymoke to lose control over the vehicle.

On cross examination Peterson conceded that other explanations existed for the cause of the crash because the drive train of the car, other than the torque converter, did not evidence failure or damage consistent with Peterson's opinion. However, a piece of the casting of the engine had been broken and it was Peterson's opinion that the loose bolt used to hold the torque converter to the flywheel had created the break. Robert A. Bailey, an employee of General Motors in its engineering staff division, testified that in his opinion the broken piece of the engine block moved inward when it broke and that the loose bolt had not caused the break on the engine casting. General Motors presented at trial a videotape presentation depicting a momentary lockup of the engine, torque converter, and flywheel on a 1976 Buick Skylark at a speed in excess of 55 miles per hour at a test track located near Warren, Michigan. Carlton F. Granthen, an analysis engineer employed by the engineering staff at General Motors, testified that the tests conducted by General Motors revealed that a mechanical interference in the torque converter and flywheel would not affect the control of the vehicle because it would still be possible to steer the vehicle and to stop the vehicle as well.

At the close of the trial the district court submitted the following instructions to the jury, in pertinent part:

"The Plaintiff must establish three essential elements in order to recover, as follows:

"First, that the Defendant manufactured and sold a 1976 Buick Skylark automobile to a dealer which at the time Defendant sold it *was in a defective condition unreasonably dangerous to the consumer or user*;

. . . . .

"*A product is in a defective condition unreasonably dangerous to the user when it has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it*, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. A product is not defective or unreasonably dangerous merely because it is possible to be injured while using it.

. . . . .

"The manufacturer of an automobile is not a guarantor that nobody will get hurt in using the automobile. All that the manufacturer is required to do is to make a product which is *free from defective and unreasonably dangerous conditions*. The mere fact that an accident has occurred, is not proof that the product was defective or unreasonably dangerous to users.

. . . . .

"Special Verdict Questions

"Members of the jury, you will be given a special verdict form which is attached to the back of these instructions. The form contains several questions for you to answer in light of the evidence in this case and under these instructions.

"The first question you will be asked to answer is question No. 1, which asks whether the 1976 Buick Skylark sold by Fisher Motors was defective in its original design or manufacture when it left

1. The remaining two special verdict questions as submitted to the jury by the trial court provided as follows:

 "QUESTION 2: (Answer this question only if your answer to Question # 1 was 'yes'.) Did an original design or manufacturing defect in the 1976 Buick Skylark proximately cause the accident of October 27, 1976?

General Motors' possession and control *so as to be unreasonably dangerous to a prospective user such as the Plaintiff*. You must answer it 'yes' or 'no'." [Emphasis added.]

The jury rendered its verdict in the following manner:

"Special Verdict

"We, the jury, duly empaneled and sworn in the above entitled action, having been requested by the Court to answer the following Questions, hereby submit our respective answers thereto, as follows:

"Question 1: Was the 1976 Buick Skylark sold by Fisher Motors defective in its original design or manufacture when it left General Motors' possession and control so as to be unreasonably dangerous to a prospective user such as the Plaintiff?

"ANSWER: ___NO___ (Yes or No)"[1]
[Handwritten]

The district court entered judgment on October 3, 1979, based on the verdict rendered by the jury. On November 16, 1979, Wilson submitted a motion to set aside the special verdict, to vacate the judgment entered thereon, and to order a new trial. The basis for Wilson's motion was the assertion that the instructions in the case constituted plain error notwithstanding the fact that Wilson's counsel did not object to the instructions and did in fact submit an instruction based upon § 402A of the Restatement of Torts 2d, and the case of *Johnson v. American Motors Corporation*, 225 N.W.2d 57 (N.D.1974). The district court denied Wilson's motion on February 4, 1980, and Wilson filed his notice of appeal from the verdict and judgment and the district court's order denying his motion for a new trial on April 4, 1980.

"ANSWER: _____ (Yes or No)
"QUESTION 3: (Answer this question only if your answer to Question # 2 was 'yes'.) Under all of the evidence and these instructions what is the total amount of money (damages) sustained by Jeffery L. Wilson?
"_____ Dollars ($___)"

Two issues are presented for our consideration:

1. Whether or not the trial court properly denied Wilson's motion to set aside the jury's special verdict, to vacate the judgment on the special verdict, and to order a new trial.
2. Whether or not the verdict of the jury was supported by the evidence.

I

The first issue concerns whether or not the district court properly denied Wilson's motion to set aside the jury's special verdict, to vacate the judgment, and to order a new trial. The decision to grant or deny a new trial rests entirely within the discretion of the trial court. *Hoge v. Hoge*, 281 N.W.2d 557 (N.D.1979). Our standard of review on appeal from a denial of a motion for a new trial is limited to a determination of whether or not the trial court manifestly abused its discretion. *Porter v. Porter*, 274 N.W.2d 235 (N.D.1979). An abuse of discretion on the part of the trial court in granting or denying a new trial is defined as an unreasonable, arbitrary, or unconscionable attitude on the part of the court. *Hoge v. Hoge, supra.*

In its memorandum opinion the district court stated that "the actions of Plaintiff's [Wilson's] Counsel prior to and throughout the trial would preclude him from now raising the issue he seeks to raise". The district court's statement reflects the fact that prior to trial and throughout the course of trial Wilson's counsel urged that the district court insert the term "unreasonably dangerous" in its instructions to the jury. An appellant may not complain of the giving of or the failure to give an instruction if, after he has had adequate time to examine and take exceptions, he fails to object. He is deemed to have waived his objections. *Nokota Feeds, Inc. v. State Bank of Lakota*, 210 N.W.2d 182 (N.D.1973); *Waletzko v. Herdegen*, 226 N.W.2d 648 (N.D.1975). Because Wilson's counsel failed to object to the instructions, the instructions given became the law of the case. *Waletzko v. Herdegen, supra.*

Rule 51(c), North Dakota Rules of Civil Procedure.

However, Wilson now argues that despite the failure to object to the instructions, the alleged errors in the instructions are nevertheless reviewable because they constitute plain error under Rule 103(d), North Dakota Rules of Evidence, which provides:

"RULE 103—RULINGS ON EVIDENCE

. . . . .

"(d) Errors affecting substantial rights. Nothing in this rule precludes taking notice of errors affecting substantial rights although they were not brought to the attention of the court."

While Rule 103(d), N.D.R.Ev., applies to evidentiary matters and not to instructions, Wilson asserts that the plain error rule should also be applicable to instructions. We believe that the case of *Rau v. Kirschenman*, 208 N.W.2d 1 (N.D.1973), governs on this question. In *Rau*, the court stated that Rule 51(c) is not an absolute rule and that relief from the operation of the rule could be given in limited circumstances where the error is fundamental and highly prejudicial and constitutes a misdirection of the jury. See also *Welken v. Conley*, 252 N.W.2d 311 (N.D.1977). This rule represents a modification of the general rule that in the absence of objections all exceptions to the instructions and verdict forms are waived. *Geck v. Wentz*, 133 N.W.2d 849 (N.D.1964); *Bartholomay v. St. Thomas Lumber Company*, 148 N.W.2d 278 (N.D.1966); *Matter of Estate of Honerud*, 294 N.W.2d 619 (N.D.1980).

Although the district court stated that Wilson had waived his right to object to the instructions, the court did consider the substantive questions of law raised by Wilson's motion. Wilson asserted that the jury should have been instructed that, if a defect existed in the vehicle at the time it left the control of the defendant and the defect was the proximate cause of the accident, the jury should find in Wilson's favor. The jury was instructed that, in order to find in Wilson's favor, the jury was required to find that the car was defective so as to be unreasonably dangerous to Wilson.

Strict liability in tort was adopted by the court in *Johnson v. American Motors Corporation*, 225 N.W.2d 57 (N.D.1974), and is modeled after § 402A, 2 Restatement of Torts 2d. The Official Comment to § 402A establishes that the concept of "unreasonable danger" is an essential element of the doctrine of strict liability. The requirement of unreasonable danger is also contained in § 28–01.1–05 of the North Dakota Century Code, which provides, in pertinent part:

"*28–01.1–05. Determination of defective product and rebuttable presumption against defects.* 1. No product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

"2. As used in sections 28–01.1–01 through 28–01.1–05, 'unreasonably dangerous' means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer. . . ."

 The requirement of unreasonable danger is an integral part of the strict liability in tort doctrine in North Dakota and the district court properly instructed the jury on the law applicable to the case. A different result might be warranted if Wilson had pleaded negligence as an alternative ground. However, Wilson deleted the negligence count in his second amended complaint and proceeded at trial solely on the basis of strict products liability. A plaintiff relying upon the theory of strict liability in tort cannot prevail simply by proving a product defect and causation of the injury which the plaintiff suffered. Thus, the jury instructions were not erroneous and the district court properly denied Wilson's motion for a new trial because no misdirection of the jury occurred. In addi-

tion, Wilson may not challenge the jury instructions given because a party cannot be heard to challenge jury instructions which are the result of his own request. *Hook v. Crary*, 142 N.W.2d 140 (N.D.1966); *Zimmer v. Bellon*, 153 N.W.2d 757 (N.D. 1967); *John Deere Co. v. Nygard Equipment, Inc.*, 225 N.W.2d 80 (N.D.1974).

## II

██ ██ The second issue concerns whether or not the verdict of the jury was supported by the evidence. Our review is limited to consideration of whether there is substantial evidence to sustain the verdict and if substantial evidence exists, we are bound by the verdict. *Boe v. National Farmers Organization, Inc.*, 277 N.W.2d 291 (N.D. 1979); *Johnson v. Monsanto Co.*, 303 N.W.2d 86 (N.D.1981). We must view the evidence in the light most favorable to the verdict. *Vallejo v. Jamestown College*, 244 N.W.2d 753 (N.D.1976); *Kresel v. Giese*, 231 N.W.2d 780 (N.D.1975). Where the evidence is in conflict and reasonable men might draw different conclusions on the evidence, we are bound by the verdict. *Belinskey v. Hansen*, 261 N.W.2d 390 (N.D. 1977); *Welken v. Conley*, 252 N.W.2d 311 (N.D.1977). A motion for a new trial on the ground of insufficient evidence to sustain the verdict is directed to the sound discretion of the trial court and the court's action will not be disturbed on appeal in the absence of an abuse of discretion. *Johnson v. Monsanto Co., supra; Eakman v. Robb*, 237 N.W.2d 423 (N.D.1975).

Wilson offered a single theory of product defect in support of his strict liability in tort claim against General Motors. Wilson's expert, Donn Neal Peterson, advanced the theory that one of the three bolts used to fasten the torque converter and flywheel separated prior to the crash and lodged between the torque converter and inside of the bellhousing of the transmission locking the car's rear wheels. General Motors attacked Peterson's theory by asserting that the theory was based upon erroneous assumptions and misconceptions on how the

car worked. For instance, Peterson viewed as important to his theory the fact that elongation of the holes on the flywheel was caused by a "chucking" type of rotational movement which resulted from the bolts being either too small for the hole or not sufficiently tightened or torqued. However, General Motors established through the testimony of Robert Bailey that the flywheel was designed and manufactured with elongated holes to account for manufacturing tolerances and ease of assembly. In addition, one of the holes was elongated radially, while the other holes were elongated circumferentially. Peterson could not present an explanation for this difference and why he overlooked this fact in developing his theory.

General Motors also established that Peterson was not fully aware of the fundamental operational characteristics and design of the THM 200 transmission used in the car. Peterson testified that a series of "rotors" and "stators" operated in a fluid body as an explanation for the internal functioning of the transmission; yet, General Motors established that the transmission transmitted motion through the engagement of planetary gear sets. The transmission does not incorporate rotors and stators and does not utilize a fluid coupling to transmit motion within the transmission.

Peterson also attempted to reconstruct the accident; however, during cross-examination Peterson conceded that he had misread the accident report and that a correct description of road conditions at the time of the accident was "clear and dry" rather than "sleet/hail/freezing rain". Peterson relied upon several photographs obtained from the North Dakota State Highway Patrol in reconstructing the accident. However, all of the photographs he received were not from the crash in which Wilson was injured, but, rather, were from three separate crashes and two accidents not applicable to the instant case.

No evidence consistent with Peterson's theory was clearly established at the trial because the investigating patrolman who examined the road on the day of the accident found no tire marks indicative of "rear wheel lockup" or skidding and the only evidence of tire marks was based upon Peterson's inspection of accident photographs of different accidents. No evidence was presented which would establish the "awful noise" or chatter caused by a loose bolt connecting the torque converter and flywheel becoming separated and lodging in this area. Indeed, Rodney Hunter testified that there were no unusual noises prior to the accident. The fracture in the engine block could have been caused when the undercarriage of the vehicle struck the concrete culvert and the expert testimony of Robert Bailey established that the loose bolt could not have worked backwards out of the hole a sufficient distance to strike the back of the engine block as the flywheel and torque converter assembly was rotating.

■ Finally, General Motors established that a rear wheel lockup was physically impossible under Peterson's theory because of the inherent design of the transmission and power train components. A video presentation which simulated the mechanical interference posited by Peterson was presented by General Motors. The video presentation demonstrated that when the engine is stopped instantaneously, no effect is transmitted to the drive shaft and rear axle of the vehicle. Although Wilson presented evidence at the trial that the bolts connecting the flywheel and torque converter were not properly torqued at one time, General Motors presented evidence showing that Peterson's theory of a rear wheel lockup was impossible. Thus, the evidence at the trial was sufficient to sustain the jury's special verdict and the district court did not abuse its discretion in denying Wilson's motion to set aside such jury verdict, to vacate the judgment entered thereon, and to order a new trial.

For reasons stated in this opinion, the special verdict of the jury, the judgment of the district court on the special verdict, and the order denying a new trial are affirmed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.