**Hygenus (Gene) KUNNANZ, Plaintiff and Appellee,**

v.

**Lori (Mrs. Dennis) TUFF, Defendant and Appellant.**

**Civ. No. 10070.**

Supreme Court of North Dakota.

March 25, 1982.

William P. Teevens argued, of Teevens, Johnson & Montgomery, Minot, for defendant and appellant.

Michael S. McIntee, Towner, for plaintiff and appellee.

PAULSON, Justice.

Hygenus Kunnanz [Gene] commenced an action against Lori (Mrs. Dennis) Tuff [Lori] for alienation of affections.

Prior to the trial of the action for alienation of affections, Lorraine Kunnanz commenced an action for divorce against Hygenus Kunnanz in 1978. Thereafter, Gene answered the divorce complaint by filing an answer, counterclaim, and cross-complaint; together with a third-party claim against Lori Tuff. The divorce action and the third-party claim, which alleges alienation of affections, were severed by the trial court. The divorce action was settled. The decree of divorce, among other things, provided that the custody of the three minor children of the Kunnanzes, that is, Douglas Wayne Kunnanz, born August 12, 1962; Kevin Keith Kunnanz, born August 29, 1964, and Steven Craig Kunnanz, born November 12, 1965, was granted to Lorraine

Kunnanz, subject to reasonable rights of visitation granted to Gene; and it further provided that Lorraine would have the use and occupancy of the home, which would be held in joint tenancy until the youngest child attained the age of eighteen years.

The third-party claim alleges that Gene and Lorraine had been married for 20 years; that Lorraine and Lori had become very close friends the last four years and, consequently, Lorraine had abandoned her family and husband; that Lori has advised Lorraine not to listen to Gene and not to pay any attention to the family and, further, that Lori's actions destroyed the marriage and resulted in the divorce, all of which caused great mental suffering on the part of Gene, to Gene's damage. Lori interposed an answer, as well as an amended answer, which generally denies the allegations that Lori's actions have in any manner interfered with the Kunnanz marriage and alleges that the Kunnanz marital problems were caused by Gene, and that Gene had slandered Lori, and such slanderous statements have caused Lori great mental and emotional harm; and, as a result, Lori prayed for general damages and exemplary damages. A reply denying the counter-claim was timely filed.

As heretofore mentioned, the trial commenced on April 16, 1981. Jeffrey James Kunnanz, second oldest son of Gene and Lorraine, born July 29, 1960, testified that there were five children in the family, namely, Rodney Gene Kunnanz, born May 29, 1959; himself; Douglas Wayne Kunnanz, born August 12, 1962; Kevin Keith Kunnanz, born August 29, 1964; and Steven Craig Kunnanz, born November 12, 1965. Jeffrey testified that he was 20 years of age, that he had finished high school in Rugby and then moved to the State of Washington in July of 1979; that he has known the defendant, Lori, for the past six or seven years; that when Lori started coming to the Kunnanz home in the early '70's, the social relationship between his father and mother grew steadily worse because his mother was always with Lori, and when his parents associated with other couples, his mother usually wanted to include Lori, and that Lori had to be included in everything the family did, according to his mother's wishes. Jeffrey testified that Lori was the person who usually came over to the Kunnanz home and would be there for coffee nearly every afternoon, and that if he came in to watch television, Lori would be sitting in the front room and would inform him to get out; or if he desired to listen to stereo, he was not allowed in the room with the stereo or in any other room where they were sitting. He stated that his mother's actions were never like that before Lori had become acquainted with the family. He testified that normally his mother just came home in time for supper and she left for bingo, or some other place after supper, with Lori which was on the average of four or five times a week; that his mother was not normally home on Saturdays; that Lori would arrive at the house in her automobile and both of them would leave in Lori's car; that his mother would usually state that they were leaving town and were going to Minot or sometimes would state that it was none of his business; that his father never accompanied them on these trips and they would return home usually late in the evening. He stated this was a constant thing and was a subject continually discussed between his father and mother, and their disagreements were centered around his mother's spending too much time with Lori. He testified that one time when he was parked in the family driveway and Lori parked her car behind him and he asked her to move and Lori objected to his parking his car there and she wouldn't move her car, his mother came out and stated as she was leaving with Lori that when she got home he had better not be there.

Jeffrey testified that there were many phone conversations between Lori and his mother and that he would know as soon as his mother answered the phone with whom she would be talking; that she told his father to get off the phone while she was talking with Lori; that his mother was gone most weekends to Minot over a period of a year and a half and that this was true

even before the divorce action was commenced, and the last several months he was home the disagreements became more severe and more frequent. He testified that Lori was the cause of the dissension between his parents, that it resulted from Lori's actions, and that Lori caused the breakup of the marriage.

On cross-examination Jeffrey reiterated his statement that the breakup of his parents' marriage was caused by Lori.

Douglas Wayne Kunnanz testified that he still resided at home but his mother informed him that if he testified at the trial, he would have to move from the home and that if he did so, she never wanted to see him again. He stated that Lori was nearly always at the family home for coffee; that Lori and his mother went to Minot nearly every Saturday during the last several years; that his mother would prepare 15-minute meals mostly, consisting of hot dogs or hamburgers. He further testified that when Lori was in the Kunnanz home she acted more like a boss than a guest and he verified Jeffrey's testimony concerning Lori's informing them to leave any room where she and their mother were together visiting or having coffee. Douglas also stated that the family relationship deteriorated after Lori began interfering with the family. He said he informed his mother and father that Lori was interfering too much in family affairs, and was causing family trouble.

Kevin Keith Kunnanz testified that he heard his mother tell Douglas that, if he were going to testify against Lori, that Douglas would have to leave home and not return and that that also applied to him, Kevin; and, further, he stated that his mother was gone almost every Saturday. He also testified that Lori had used vulgar language in making reference to his father in connection with this action being filed against her.

Rodney Gene Kunnanz testified on behalf of his father, stating that he left Rugby in March of 1979 and lived in the State of Washington. He stated that his mother and Lori became close friends when they worked at the Haaland Home; that his mother's association with Lori became substantially more frequent when they worked at the clinic in Rugby; that Lori and his mother traveled to Minot, Harvey, Devils Lake, or Towner on weekends, but his father did not accompany them; that everything about the trips was prearranged by his mother and Lori. He testified that there was little dissension between his parents prior to Lori's interference in the family relationship which resulted in the divorce.

On cross-examination, Rodney stated that his mother and Lori would have coffee between five and six o'clock in the evening and that the family suppers were hurried meals, requiring little preparation, and that his mother would leave home immediately after supper. Also, on cross-examination Rodney reaffirmed that Lori's actions caused the breakup of his parents' marriage.

Steven Craig Kunnanz testified that he loves both his father and his mother and he reaffirmed his brothers' statements as to what his mother had stated about kicking the brothers out of the home if they testified against her. He stated that 90% of the arguments centered around Lori.

Gene Kunnanz testified that he was 45 years old; that he was a mechanic; that he first met Lori at an American Legion club; that Lori started coming to the Kunnanz home more and more often and that Lori almost continually had his wife accompany her to Minot, on Saturdays. He further testified that Lori would usually be at the Kunnanz home for coffee nearly every day during the late afternoon and that the meals Lorraine served were prepared in short order, like bachelor meals, something that you could throw together quick. He testified that Lori broke up the marriage; that Lori and Lorraine were always on the phone and if he desired to use it, Lorraine would tell him to get off the phone when she was visiting with Lori.

Lorraine Kunnanz conceded in her testimony that she told two of her boys that if they testified against her, they shouldn't

come home; that they would be lying, and this would harm them for the rest of their lives; she also denied any improper relationship with Lori, but did testify that her boys came home from school and mentioned to her that there were rumors about a close relationship between her and Lori. She testified that she did not recall the incident related by the boys that at one time Jeffrey had parked his car in the family driveway and that Lori had parked behind his car and Lori told Jeffrey he wasn't supposed to be home.

Al Hamby testified that Lori had separated from her husband and moved to Minot in November or December of 1980.

Lori testified that she lives in Minot; that she has been separated from her husband; and that she first met Gene and Lorraine in 1969. She also admits that Lorraine and she went to Minot occasionally on Saturdays, as well as to Towner and Devils Lake. She stated that she was at the Kunnanz home many times for coffee, but denied that she was the cause of the breakup of their marriage, and further asserts that she lost her school job because of the statements being made concerning her reputation; she also stated that waitresses would come up to her and ask her what was the problem, in relation to such rumors. However, Lori stated also that she did not sign any contract with the school for the 1980–1981 year for work because of the discussion about the lawsuit, which is in direct contradiction to her statement that she lost her job because of the statements made about her reputation. She also admits that she and Gene were not friendly and that they shared a mutual dislike for each other. She testified that the four Kunnanz boys lied when they testified against her, but she admits that she and Lorraine did return home some nights between ten o'clock and midnight; and she admitted probably using profanity with reference to Gene's action in filing suit against her.

Dennis Tuff, Lori's husband, testified that he knew the Kunnanzes; that the filing of the alienation of affections suit against Lori changed her disposition and made her extremely nervous; that she sought medical care and, in his opinion, the damage to his wife's reputation was worth $750,000.

Alice Koble, who was a witness for Lori, stated that Gene spoke only in generalities, not in specifics, when he discussed the lawsuit against Lori, and did not mention any particular case or person against whom the suit had been commenced.

Cecelia Hill testified that she lived in Rugby and that she had been acquainted with the Kunnanzes for 20 years and that formerly the families were together practically every night. She also stated that she ran into Lorraine Kunnanz and Lori Tuff in Minot at least a dozen times a year.

After the trial was concluded the district court of Pierce County submitted instructions to the jury. Neither Gene nor Lori objected to such instructions. The trial court also submitted special verdict questions to the jury, in pertinent part:

[Heading and title omitted]

"SPECIAL VERDICT

"Members of the Jury, bearing in mind the instructions heretofore given, you will now answer the following special issues or questions.

"We, the Jury in the above-entitled action, by a preponderance of the evidence unanimously find the following answers to the special questions are submitted:

"*QUESTION NO. 1:* Do you find from a preponderance of the evidence that the Defendant has abducted or enticed the wife of the Plaintiff from the Plaintiff, thereby directly causing the Plaintiff the loss of the society, affection and assistance of his wife?

"Answer 'yes' or 'no.' ANSWER: yes

(NOTE: If the Jury's answer to Question No. 1 is 'no,' *do not* answer Question No. 2, but go on to consider Question No. 4. If the Jury's answer to Question No. 1 is 'yes,' go on to consider Question No. 2.)

"*QUESTION NO. 2:* Do you find from a preponderance of the evidence that the Defendant intended by her conduct to alienate the affections of the Plaintiff's wife for the Plaintiff?

"Answer 'yes' or 'no.' ANSWER: yes

(NOTE: If the Jury's answer to Question No. 2 is 'no,' *do not* answer Question No. 3, but go on to consider Question No. 4. If the Jury's answer to Question No. 2 is 'yes,' go on to consider Question No. 3.)

"*QUESTION NO. 3:* State the sum of money that will fairly and reasonably compensate the Plaintiff for his damage caused by the acts of the Defendant. $10,000

(a) Do you award the Plaintiff interest? Answer 'yes' or 'no.' ANSWER: yes

"*QUESTION NO. 4:* Do you find from a preponderance of the evidence that the Plaintiff has made false and unprivileged statements which tend directly to injure the Defendant in respect to her office, profession, trade or business, either by imputing to her general disqualifications in those respects which the office or other occupation particularly requires, or by imputing something with reference to her office, profession, trade or business that has a natural tendency to lessen its profits?

"Answer 'yes' or 'no.' ANSWER: No—

(NOTE: If the Jury's answer to Question No. 4 is 'no,' *do not* answer Question No. 5, but date and sign the verdict and return it in open court.)

"*QUESTION NO. 5:* State the sum of money that will fairly and reasonably compensate the Defendant for her damage caused by the Plaintiff. $————

(a) Do you award the Defendant interest?

Answer 'yes' or 'no.' ANSWER: ————

"*QUESTION NO. 6:* Do you award the Defendant exemplary damages against the Plaintiff for the sake of example and by way of punishing the Plaintiff?

Answer 'yes' or 'no.' ANSWER: ————

(a) If so, state the sum of money which will reasonably constitute such example and punishment. $————"

The jury answered only the first four of the special verdict questions submitted to them. The parties to the action did not object to the form of the special verdict.

This is the first time that this court has been involved with this particular type of alienation of affections action.

The issues are as follows:

1. Whether or not the court abused its discretion by denying the motion for judgment notwithstanding the verdict, as well as the motion for a new trial; and

2. Whether or not this court has the authority to abolish the statutory action for alienation of affections.

Lori's first contention is that in order to establish a claim for alienation of affections, three elements must be present: (1) wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) a causal connection between such conduct and loss. In addition, the trial court, in one of its instructions, set forth proof of intent as one of the elements of proof, and the same may be inferred from the surrounding circumstances. Lori, in support of her contention that the facts in the instant case do not establish the necessary elements, cites *Tice v. Mandel*, 76 N.W.2d 124, 129 (N.D.1956). 41 Am.Jur.2d, *Husband and Wife* § 466, p. 393. However, this contention is unpersuasive because the factual situation in *Tice, supra*, is vastly different from that in the case at bar. In the *Tice* case, there was an involvement between a husband and his alleged paramour, but in the instant case the alienation of affections action is based upon the acts of a married woman interfering with the marital relationship of Gene and Lorraine Kunnanz. Lori has not recognized that the case was decided by a jury, pursuant to the submission to the jury of a

special verdict. The jury rendered its special verdict in favor of Gene Kunnanz. Lori concedes that there was neither an objection to the form of the special verdict nor any objection to the instructions to the jury.

█ We next consider Lori's appeal from the order denying the motion for judgment notwithstanding the verdict. Gene has urged that Lori failed to make a motion for a directed verdict. However, a review of the record reveals that such motion was timely made. This court said, in *Linington v. McLean County*, 161 N.W.2d 487, 491–492 (N.D.1968):

"Where such a motion has been denied, the evidence must be considered in a light most favorable to the party in whose favor the verdict was rendered. Such motion admits the truth of all inferences and conclusions which can reasonably be drawn from the evidence which are favorable to the party opposing the motion. Such motion should not be granted where there is an issue for the jury to pass on. *Bartholomay v. St. Thomas Lumber Company*, 148 N.W.2d 278 (N.D.1966); *Linington v. McLean County*, 146 N.W.2d 45 (N.D.1966); *Larson v. Meyer*, 135 N.W.2d 145 (N.D.1965); *Chicago, M.St.P. & P.R.R. Co. v. Johnston's Fuel Liners*, 130 N.W.2d 154 (N.D.1964); *Bell v. Cardinal Drilling Co.*, 85 N.W.2d 246 (N.D.1957). Furthermore, on an appeal from an order denying motion for judgment notwithstanding the verdict, the only grounds which will be considered will be those which were assigned on the motion for a directed verdict. *Hanson v. Fledderman*, 111 N.W.2d 401 (N.D.1961); *Leach v. Kelsch*, 106 N.W.2d 358 (N.D.1960)."

We have carefully considered the court's rulings with reference to the motion for a directed verdict and the evidence in the instant case and have determined that Lori would not have been entitled to a directed verdict at the close of the trial. Thus the trial court did not commit error in denying Lori's motion for a judgment notwithstanding the verdict.

We will next consider Lori's contention that the trial court committed error in de-

nying the motion for a new trial. This motion was based upon the ground that the evidence was insufficient to support the verdict. The motion is pertinent to the action because it is determinative of whether or not the trial court erred in denying a new trial.

█ Our court has enunciated a rule that, generally, its decision to grant or deny a new trial rests entirely within the discretion of the trial court. In *Wilson v. General Motors Corp.*, 311 N.W.2d 10, 14 (N.D.1981), this court also followed this reasoning. *Hoge v. Hoge*, 281 N.W.2d 557 (N.D.1979); *Porter v. Porter*, 274 N.W.2d 235 (N.D. 1979); and *Fox v. Bellon*, 136 N.W.2d 134 (N.D.1965). Our standard of review on an appeal from a denial of a motion for a new trial is limited to a determination of whether or not the trial court manifestly abused its discretion. *Porter v. Porter, supra.* The test of whether or not there has been an abuse of discretion on the part of the trial court in granting or denying a new trial is defined as an unreasonable, arbitrary, or unconscionable attitude on the part of the court. *Hoge v. Hoge, supra.* We adopt the above rationale.

In a number of decisions, we have stated that in order to sustain the verdict it should be supported by substantial evidence [*Johnson v. Monsanto Co.*, 303 N.W.2d 86 (N.D. 1981)], and, where substantial evidence exists, we are bound by the verdict. *Wilson v. General Motors Corp.*, 311 N.W.2d 10 (N.D. 1981); *Boe v. National Farmers Organization, Inc.*, 277 N.W.2d 291 (N.D.1979).

█ In the instant case there is substantial evidence to sustain the verdict and, accordingly, we are bound by it. *Vallejo v. Jamestown College*, 244 N.W.2d 753 (N.D. 1976). In *Wilson, supra* 311 N.W.2d at 15, this court stated:

"Where the evidence is in conflict and reasonable men might draw different conclusions on the evidence, we are bound by the verdict. *Belinskey v. Hansen*, 261 N.W.2d 390 (N.D.1977); *Welken v. Conley*, 252 N.W.2d 311 (N.D.1977). A motion for a new trial on the ground of

insufficient evidence to sustain the verdict is directed to the sound discretion of the trial court and the court's action will not be disturbed on appeal in the absence of an abuse of discretion. *Johnson v. Monsanto, supra; Eakman v. Robb,* 237 N.W.2d 423 (N.D.1975)."

We believe that the evidence adduced in this case is sufficient to sustain the verdict. *Fox v. Bellon,* 136 N.W.2d 134, 138 (N.D. 1965); *Hamre v. Senger,* 79 N.W.2d 41, 47 (N.D.1956).

The final issue is whether or not this court can abolish the action of alienation of affections. We are confronted here with subsection 2 of § 14–02–06 of the North Dakota Century Code, which specifically provides for such an action. Section 14–02–06(2), N.D.C.C., has been in effect since its adoption in 1877, although it has since been amended, and it presently provides, in pertinent part:

"*14–02–06. Offenses against personal relation.* The rights of personal relation forbid:

.   .   .   .   .

"2. The abduction or enticement of a wife from her husband . . . ."

Lori urges that we should abolish this statute on the basis of public policy and in support thereof cites *Tice v. Mandel,* 76 N.W.2d 124 (N.D.1956). The *Tice* case recognizes the right of an individual to bring such an action, as does *King v. Hanson,* 13 N.D. 85, 99 N.W. 1085 (1904). These two cases do not buttress Lori's contention. Lori also cites *Funderman v. Mickelson,* 304 N.W.2d 790 (Iowa 1981). *Funderman, supra,* is distinguishable on the ground that it was decided on common law and not on the basis of a statute.

As held by this court, in *McKee v. Kinev,* 160 N.W.2d 97 (N.D.1968), in syllabus paragraph 2:

"2. In this State there is no common law in any case where the law is declared by the Code. Sec. 1–01–06, N.D.C.C."

Even though the Legislature has amended § 14–02–06, N.D.C.C., several times since its enactment, it has not abolished the action. Any repeal of the statute is entirely within the province of the Legislature.

The order denying the motion for judgment notwithstanding the verdict and for a new trial is affirmed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.