Hilda KAUFMAN, Plaintiff, Appellee, and Cross-Appellant,

v.

MEDITEC, INC., Defendant,

Minnesota Mining and Manufacturing Company, a/k/a 3M Company, Defendant, Appellant, and Cross Appellee.

Civ. No. 10542.

Supreme Court of North Dakota.

July 11, 1984.

Paul G. Kloster [argued], of Mackoff, Kellogg, Kirby & Kloster, Dickinson, for appellant and cross-appellee Minnesota Mining and Mfg. Co.

Claudette Abel, of Mackoff, Kellogg, Kirby & Kloster, Dickinson and Thomas A. Boardman, St. Paul, Minn., general counsel, for 3M Co.

Dann E. Greenwood [argued], of Greenwood, Greenwood & Greenwood, Dickinson, for appellee and cross-appellant.

GIERKE, Justice.

This is an appeal by the defendant, Minnesota Mining and Manufacturing Company [3M] from a judgment entered on a jury verdict in the District Court of Stark County. We vacate and remand.

On October 21, 1974, the plaintiff, Hilda Kaufman [Kaufman], underwent a total hip replacement surgery wherein her left hip was replaced. This surgical procedure included the implantation of a prosthetic hip pin into the femur bone. The pin was secured to the femur with a bone cement, known as Surgical Simplex P Radiolucent Bone Cement. The function of the cement is to transmit the patient's weight from the stem of the pin to the surrounding bone.

The prosthetic hip pin was implanted by Dr. Ervin P. Wenz at the Dakota Hospital in Fargo, North Dakota. Kaufman's right hip had been replaced by Dr. Wenz in the same manner in March of 1973. The pin used by Dr. Wenz in replacing Kaufman's left hip was a 22mm Charnley-style femoral stem manufactured by Meditec. 3M is the successor in interest to Meditec.

Approximately five years later, in October of 1979, Kaufman began to experience pain in her groin area. X-rays taken on December 3, 1979, revealed that the pin implanted in Kaufman's left femur was broken. On December 7, 1979, the broken pin was removed by Dr. Wenz.

Dr. Wenz encountered much difficulty in removing the fractured pin because the lower portion was firmly embedded in the bone cement. The doctor attempted to drill a hole into the lower portion of the pin in order to attach a reverse screw and thereby pull the pin out. Dr. Wenz's tools, however, did not have enough speed to penetrate the metal alloy. He therefore elected to cut a "window" into Kaufman's femur at a point approximately one-and-one-half to two inches below the lower tip of the pin. He was then able to remove some of the cement and bone securing the pin and tap the pin up and out the top of the femur. Dr. Wenz then replaced the pin with a second standard size Charnley-style femoral stem.

On June 26, 1980, Kaufman fell and broke her left femur at the point where Dr. Wenz had cut the "window", in December of 1979. The second pin did not break but surgery was required to repair the bone. The surgery was performed by Dr. Norman B. Ordahl of Dickinson, North Dakota. Dr. Ordahl fastened a metal plate over the break, using six screws to attach it to the bone.

Following the June 1980 surgery, Kaufman's femur did not mend properly. In May of 1981 she was placed in a body cast for approximately six weeks but the femur still did not heal. Kaufman was then referred back to Dr. Wenz in Fargo.

Dr. Wenz's solution was to replace the pin he had earlier implanted in Kaufman's leg with a longer pin which extended to a point below the "window" and to graft

bone around the break. Another period of convalescence followed, but, at the time of trial, Kaufman was able to walk with the use of a cane.

Kaufman commenced this action on November 17, 1981, against 3M and Meditec, Inc. She claims damages under theories of strict product liability, negligence, and breach of warranty for the injuries resulting from the fracture of the prosthetic hip pin in October of 1979. 3M's separate answer denied that the hip pin was defective; that the hip pin was negligently designed or manufactured; or that any express or implied warranties were breached. 3M further asserted that Chapter 28–01.1, N.D. C.C., excluded the application of strict liability principles to Kaufman's cause of action.

Prior to trial, the district court ruled that 3M was responsible for the acts of Meditec. The court also ruled that there was no basis for Kaufman's claim for breach of warranty because the statute of limitations had run. At trial Kaufman abandoned all claims of negligence. Those rulings have not been appealed. The sole issue remaining at trial was whether or not the pin was defective, as defined by the doctrine of strict liability in tort.

The testimony at trial centered primarily on whether or not the alloy used to make the prosthetic hip pin and the manufacturing process employed were appropriate; whether the pin contained defects that made it unreasonably dangerous to the user; whether more suitable alloys were available during the relevant time period; and whether other factors contributed to the fracture of the pin.

In summary, Kaufman's position at trial, as presented by Dr. F.D.S. Marques, was that the hip pin broke as the result of two casting defects in the metal and a notch on the side of the pin, which was most likely caused by post-manufacture handling. In Dr. Marques's opinion, the hip pin failed as a result of the casting defects within the pin. He testified that the defects were manufacturing defects which contributed substantially to the pin's failure and that they could not be considered normal in a casting of reasonably good quality. He further testified that the defects predisposed the hip pin to failure by fatigue and that they could have been detected by nondestructive means. Regarding the presence of the notch caused by post-manufacture handling, Dr. Marques stated that the fracture of the pin would have occurred even without it, but that its presence merely defined the point at which the fracture originated.

3M's position, as presented by its metallurgical experts, was that the alloy used in the manufacture of the hip pin was the most widely used, strongest, and most biocompatible material available; that it met and surpassed the applicable standards; that it was subjected to and passed a number of stringent quality control tests designed to detect irregularities that might constitute defects; and that the pin was not defective.

3M also presented evidence that a number of other factors may have contributed to the pin's failure. Of particular significance were Kaufman's overweight condition; bone resorption in Kaufman's left femur, and consequent looseness of the pin in the cement; and the surgical technique employed by Dr. Wenz in the original 1974 surgery.

The jury returned a verdict in favor of Kaufman and awarded damages of $234,-691.43. Judgment was entered on July 11, 1983. On July 21, 1983, 3M moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial and for a review of taxation of costs. The district court denied the motions but reduced the costs taxed against 3M. An amended judgment on jury verdict was entered on October 6, 1983. 3M appeals from the amended judgment. Kaufman also filed a cross-appeal from the amended judgment, questioning the district court's action in reducing her costs and disbursements from $20,-972.38 to $9,052.97.

3M has presented a number of issues on appeal. Because we find it dispositive of this appeal, we will begin with 3M's argu-

ment that the jury was incorrectly instructed regarding the meaning of "unreasonably dangerous" within the context of an action for strict liability in tort.

 The doctrine of strict liability in tort imposes liability on the manufacturer or seller, or both, for injuries sustained as a result of a defective condition, unreasonably dangerous to a consumer or his property, or for failure to give adequate and proper warning. *Day v. General Motors, Corp.*, 345 N.W.2d 349 (N.D.1984); *Olson v. A.W. Chesterton Co.*, 256 N.W.2d 530 (N.D.1977); *Johnson v. American Motors Corp.*, 225 N.W.2d 57 (N.D.1974). In order to recover under this doctrine, the plaintiff must show by a preponderance of the evidence that the product was defective in design or manufacture; that the defect rendered the product unreasonably dangerous to the consumer; that the defect existed when the product left the manufacturer; that the product was expected to and did reach the consumer without substantial change in its condition; and that the defect was a proximate cause of the plaintiff's injuries. *Stillwell v. Cincinnati, Inc.*, 336 N.W.2d 618 (N.D.1983); *Wilson v. General Motors Corp.*, 311 N.W.2d 10 (N.D.1981).

Of particular concern in this case is the requirement that the defect render the product "unreasonably dangerous". This requirement is an integral part of the doctrine of strict liability in tort in North Dakota. *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591 (N.D.1984); *Stillwell v. Cincinnati, Inc., supra; Wilson v. General Motors Corp., supra.*

In its instructions to the jury, the court stated that:

"Before the rule [of strict liability] can be applied in this case, you must first find (1) that the product in question was *defective* in design or condition when it *left the possession or control* of Meditec, Inc., and (2) that it was *unreasonably dangerous* to the Plaintiff. A product is *defective* in design or condition if it fails to perform reasonably, adequately, and safely any ordinary use of the product anticipated, or for which it was designed,

by the manufacturer. [Emphasis in original.] *A product which is defective in condition or design is unreasonably dangerous if ordinary use of the product in the manner anticipated or for which it was designed by the manufacturer creates a substantial risk of physical harm to the user or consumer."* [Emphasis added.]

The instruction was taken without substantive change from North Dakota Jury Instruction No. 450. NDJI 450 was adopted by a joint committee of the North Dakota Judicial Council and the State Bar Association of North Dakota on January 7, 1977.

 It must be recognized that the North Dakota Jury Instructions are suggested instructions only. They must be considered in light of our previous decisions and the ever-developing law of products liability. *See State v. Jacob*, 222 N.W.2d 586, 589 (N.D.1974).

In 1979, the North Dakota Legislature adopted a products liability Act which is codified at Chapter 28–01.1, N.D.C.C. Section 28–01.1–05 sets forth the following rules to be applied in products liability actions:

*"28–01.1–05. Determination of defective product and rebuttable presumption against defects.*

"1. No product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

"2. As used in sections 28–01.1–01 through 28–01.1–05, 'unreasonably dangerous' means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or experience pos-

sessed by that particular buyer, user, or consumer.

"3. There is a rebuttable presumption that a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product or the methods and techniques of manufacturing, inspecting, and testing the product were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product or the methods and techniques of manufacturing, inspecting, and testing the product were adopted."

3M's Requested Jury Instruction No. 22, defining "unreasonably dangerous", which was rejected by the trial court, was substantially the same as the definition contained in § 28–01.1–05(2), N.D.C.C. The requested instruction states, in relevant part:

"1. The product is dangerous to a degree which exceeds that which would be contemplated by an ordinary and prudent user of that product considering the product's characteristics, risks, dangers, and uses, together with any actual knowledge, training, or experience possessed by that particular user; ..."

 The instruction given by the trial court, when viewed in the light of § 28–01.1–05(2), N.D.C.C., and this court's decisions, is entirely too broad. In practical effect, under the trial court's instruction, a jury need only find a defect and resultant physical injury during the course of ordinary use in order to impose liability on a manufacturer. As we stated in *Wilson v. General Motors Corp., supra* 311 N.W.2d at 15: "A plaintiff relying upon the theory of strict liability in tort cannot prevail simply by proving a product's defect and causation of the injury which the plaintiff suffered". The instruction given to the jury in this case effectively omitted consideration of whether or not the product was "unreasonably dangerous" as defined by § 28–01.1–05(2), N.D.C.C.

 The law governing our review of jury instructions is well established. The instructions must fairly inform the jury of the law that must be applied. On appeal, however, jury instructions must be reviewed as a whole and, if they correctly advise the jury as to the law, they are sufficient although parts of them standing alone may be erroneous and insufficient. *Besette v. Enderlin School Dist. No. 22*, 310 N.W.2d 759 (N.D.1981). Upon review of the instructions in this case, we are unable to conclude that as a whole they correctly apprise the jury of the law of strict products liability. Because the requirement that a product must be proved "unreasonably dangerous" is essential in a strict liability action and because the contested instruction failed to apprise the jury of the factors to be considered in determining if a product is "unreasonably dangerous", we must vacate the judgment and remand for a new trial.

3M has raised additional issues regarding jury instructions in this case. Because these issues may arise on retrial, in the interest of judicial economy, we add the following comments.

3M contends that it was error for the trial court to deny its Requested Instruction No. 42. This instruction was entitled, somewhat unfortunately, "COMPARATIVE NEGLIGENCE". The practical effect of 3M's proposed instruction would have been to require the jury to determine what percentage of the causes of the plaintiff's injury was attributable to Kaufman's comparative conduct, what percentage was attributable to the defective product, what percentage was attributable to all other third persons, and what percentage was attributable to external factors. The instruction would also have barred Kaufman's recovery if her negligence was as great or greater than "any liability you find on the part of Meditec".

3M also requested and received instructions regarding assumption of risk and misuse of product which would have constituted a complete defense and bar to Kaufman's recovery.

In two cases decided the same day, this court discussed the issues raised by the instructions noted above. In *Day v. General Motors Corp.*, 345 N.W.2d 349 (N.D. 1984), we held that, in a personal injury action wherein the plaintiff is seeking damages under a theory of strict liability for enhanced injury based on an alleged design defect, the plaintiff's percentage of injury enhancing fault must be determined and applied on a "pure" comparative basis to reduce the plaintiff's recovery.

In *Mauch v. Manufacturers Sales & Service, Inc.*, 345 N.W.2d 338, 347 (N.D. 1984), we stated that:

> "The focus of a products-liability action is on whether or not the product is defective and unreasonably dangerous, and thus the reasonableness of the defendant's conduct under negligence concepts is not relevant to this action. The defenses ... of assumption of risk and unforeseeable misuse are, in our opinion, adequate to protect a seller or manufacturer from unjust liability in a ... [strict products liability case]."

We then went on, at 345 N.W.2d at 348, to hold that:

> "... we recognize the defense of assumption of risk—the seller has a reduced liability to one who is aware that a product is defective and unreasonably dangerous, has a reasonable opportunity to choose whether or not to expose himself to the danger, and voluntarily proceeds to use the product. We also recognize the defense of unforeseeable misuse—the seller's liability is reduced where the plaintiff misuses the product in a manner for which the seller could not be expected to anticipate or provide in the manufacture or sale of the product and where the misuse is a proximate cause of the damages sustained. When the defenses of assumption of risk and unforeseeable misuse are raised in the context of a strict products-liability action, the trier of fact must determine, on a pure comparative causation basis, the percent of the injuries proximately caused by the assumption of risk or the unforeseeable misuse and the percent proximately caused by the unreasonably dangerous defect in the product, and the plaintiff's recovery must be reduced by an amount proportionate to the damage caused by the misuse or assumption of risk."

Because we have determined that the jury was not properly instructed regarding the elements of an action in strict liability in tort, the case must be remanded for trial anew in the district court. We refuse to speculate as to what the jurors might have ultimately determined if they had been properly instructed. *See Mauch v. Manufacturers Sales & Service, Inc., supra,* 345 N.W.2d at 349.

For the reasons expressed in the opinion, the judgment of the district court is vacated and the case is remanded for a new trial.

ERICKSTAD, C.J., and PEDERSON, VANDEWALLE and SAND, JJ., concur.